~~SEALED~~

UNSEALED
2.13.09

FILED

2009 FEB 13  AM 9:30

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ KNX _____DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

'09 MJ 0473

| | |
|---|---|
| UNITED STATES OF AMERICA, | Magistrate Case No. _____ |
| Plaintiff, | COMPLAINT FOR VIOLATION OF: |
| v. | Title 18, U.S.C., Sec. 1962(d) - Conspiracy to Conduct Enterprise Affairs Through A Pattern of Racketeering Activity; Title 18, U.S.C., Sec. 1951 (Hobbs Act)- Robbery Affecting Interstate Commerce; Title 18, U.S.C., Sec. 1951 (Hobbs Act)- Extortion Affecting Interstate Commerce; |
| MAURICIO MENDEZ(1), aka Psycho, aka Cyco | |
| ERNEST SOQUI(2), aka Criminal, | |
| PHILLIP MCMILLEN(3), aka Chino, | |
| ARCADIO NIETO(4), aka Mugsy, | |
| RUBEN GONZALEZ(5), | |
| DAVID RIVAS (6), aka Espanto, | |
| GARRETT ESTOCK(7), aka Chino, | |
| ERNEST LAMPLEY (8), aka Dopey, | |
| ROSARIO MERCADO(9), aka Chaio, | |
| MELVIN BERG(10), aka Casper, | |
| RODOLFO LOPEZ(11), aka Crazy, aka Crazy Boy, | |
| GERARDO CANELA(12), aka Pirate, aka Looney, | |
| EDUARDO MACIAS(13), aka Funny, | |
| JORGE LERMA-DUENAS(14), aka Blue, | |
| JESUS RODRIGUEZ(15), | |
| Defendants. | |

The undersigned Complainant, being duly sworn, states:

## Count 1

## RICO CONSPIRACY

### The Racketeering Conspiracy

1.   Beginning at a date unknown, and continuing up to and including February 11, 2009, within the Southern District of California and elsewhere, defendants MAURICIO MENDEZ, aka Psycho, aka Cyco, ERNEST SOQUI, aka Criminal, PHILLIP MCMILLEN, aka Chino, ARCADIO NIETO, aka Mugsy, RUBEN GONZALEZ, DAVID RIVAS, aka Espanto, GARRETT ESTOCK, aka Chino, ERNEST LAMPLEY, aka Dopey, ROSARIO MERCADO, aka Chaio, MELVIN BERG, aka Casper, RODOLFO LOPEZ, aka Crazy, aka Crazy Boy, GERARDO CANELA, aka Pirate, aka Looney, EDUARDO MACIAS, aka Funny, and others known and unknown, being employed by and associated with the Mexican Mafia Prison Gang (as defined below), which Enterprise was engaged in, and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conspire with each other, and with other persons known and unknown, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and (5), and as more specifically described in paragraph 17 below.

It was a further part of the conspiracy that the defendants agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise; all in violation of Title 18, United States Code, Section 1962(d).

//

//

2

**The Enterprise**

2.   At various times material to this indictment:

a.   Defendants MAURICIO MENDEZ, aka Psycho, aka Cyco, ERNEST SOQUI, aka Criminal, PHILLIP MCMILLEN, aka Chino, ARCADIO NIETO, aka Mugsy, RUBEN GONZALEZ, DAVID RIVAS, aka Espanto, GARRETT ESTOCK, aka Chino, ERNEST LAMPLEY, aka Dopey, ROSARIO MERCADO, aka Chaio, MELVIN BERG, aka Casper, RODOLFO LOPEZ, aka Crazy, aka Crazy Boy, GERARDO CANELA, aka Pirate, aka Looney, and EDUARDO MACIAS, aka Funny (collectively "Defendants"), and others known and unknown, were members and associates of an organization whose members and associates engaged in, among other things, attempted murder, kidnapping, conspiracy to commit kidnapping, violations of the Hobbs Act (relating to interference with commerce through robbery and extortion), extortion, robbery, conspiracy to distribute drugs (including methamphetamine), and distribution of drugs (including methamphetamine). At all relevant times, this organization, known as the Mexican Mafia Prison Gang, operated in the Southern District of California and elsewhere. The Mexican Mafia Prison Gang, including its leadership, membership and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Enterprise"), that is, a group of individuals associated in fact. The Enterprise constitutes an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the Enterprise. The Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

//

//

3

## Background on The Mexican Mafia

3.   The Mexican Mafia is the largest and most established prison gang in the United States.  The Mexican Mafia was initially formed in the California state penal system and has been in existence for over thirty years.  As of the present date, the Mexican Mafia operates both in the California state prison system (as well as in other states) and in the federal Bureau of Prisons.  The Mexican Mafia operates under a hierarchical system with three basic levels - members, associates, and soldiers. The EME is further governed by a basic set of rules and operating procedures which are enforced through internal discipline, including acts of violence.

4.   The Mexican Mafia conducts and controls illegal activities not only in various penal facilities but also on the street.  The Mexican Mafia's primary illegal activities are drug trafficking, extortion, internal prison discipline, and violent crimes.  Although most Mexican Mafia members are incarcerated, members and their associates control large, violent criminal gangs that operate outside of the federal and state penal systems under the general authority of the Mexican Mafia.  The Mexican Mafia exerts significant control over most Southern California Hispanic street gangs - also known as "Sureno" gangs.

5.   Through a variety of means, incarcerated Mexican Mafia members and their associates communicate with their subordinates out of custody, who carry out various criminal activities on behalf of the respective Mexican Mafia member or associate.

6.   A percentage of the profits from these illegal activities outside of the federal and state penal systems is then transferred to the respective Mexican Mafia member or associate, or to other

4

designated individuals, such as family members – these monetary transfers are accomplished in a variety of ways, including the use of money orders.   Money generated from illegal activities (primarily extortion and drug trafficking) taking place inside penal facilities is transferred in the same ways.

7.   The Mexican Mafia has established a reputation with both law enforcement and other criminals as being a highly violent organization.   Numerous members and associates of the Mexican Mafia have been convicted of violent crimes, including murder, robbery and assault.   Mexican Mafia members and associates have also committed numerous acts of violence targeting individuals, both in custody and out-of-custody, based upon the belief that these individuals were cooperating with law enforcement.

8.   The highest level of authority in the Mexican Mafia is membership (members may also be known as "Brother" or "Carnal" or "Tio").   The Mexican Mafia does not have a single individual who runs the entire organization.   Rather, under the rules of the gang, members are considered to have equal authority and power within the organization; there are approximately 200 members of the Mexican Mafia, according to intelligence gathered by state and federal investigators.   New members are elected into the gang through a vote of existing members.   Once inducted into the gang, members are able to control the criminal activities of the lower levels in the gang so long as the respective member's actions do not violate the internal rules of the organization.

9.   To carry out the illegal activities of the gang, Mexican Mafia members utilize high-level associates (also known within the gang as "camaradas").   Members invest these high-level associates with

1  authority to oversee Mexican Mafia operations in specific areas, both

2  in penal facilities and on the street.

3      10.  The delegation of authority to control a specific area on

4  behalf of the Mexican Mafia is known within the gang as giving "the

5  keys" to the individual.  Thus, a "key-holder," (also called a

6  "llavero" or "shot-caller") is an individual who has been placed in

7  charge of a gang, neighborhood, prison, or prison yard for the purpose

8  of overseeing the Mexican Mafia's illegal operations.  As an example,

9  an associate can be given "the keys" to run a gang or neighborhood in

10 San Diego or can be given "the keys" to run a specific yard in a

11 prison.  These associates are able to order Sureno gang members to

12 carry out illegal activities in the areas over which the associates

13 have authority.

14     11.  The associates are responsible for ensuring that Mexican

15 Mafia operations (including extortion and drug trafficking) run

16 smoothly, that Mexican Mafia rules and authority are enforced, and

17 that the proceeds of illegal activities are properly distributed.  For

18 example, a "llavero" would be responsible for ensuring that part of

19 the proceeds from the illegal activities in his area of control are

20 sent to the Mexican Mafia member(s) for whom the associate works.

21     12.  The Mexican Mafia also uses a command system known as the

22 "mesa" – the table.  A "mesa" is a group of "camaradas" and soldiers

23 who are responsible for overseeing different areas under Mexican Mafia

24 control – in essence, a governing council.  For example, in a prison

25 setting, a "mesa" would consist of individuals responsible for

26 overseeing the various yards in the prison.  On the street, a "mesa"

27 could consist of individuals responsible for overseeing various

28 neighborhoods in a city.

13. The largest subgroup of the Mexican Mafia are the soldiers - i.e. Sureno gang members. These soldiers are responsible for carrying out the orders of the Mexican Mafia and for enforcing the authority of the Mexican Mafia, both inside penal facilities and on the street. As a result, soldiers are tasked with helping collect "taxes" (extortion payments) with drug trafficking activities or with the commission of violence.

14. Members, associates and affiliates of the Mexican Mafia routinely use mail drops and phones to communicate with each other. For example, a prisoner will send a letter addressed to an individual at a mail drop address. From the mail drop, the letter is then sent, either in its original form or transcribed by the person operating the mail drop, to the true intended recipient. Another form of passing information contained in such letters is for the person operating the mail drop to arrange a visit or engage in a telephone conversation with the intended recipient of the message and communicate the message orally or in person. Incarcerated Mexican Mafia members and associates know that their mail is routinely reviewed by prison authorities, particularly when the mail is addressed to other known Mexican Mafia members and/or associates. The mail drop technique is therefore used to thwart efforts of prison authorities to monitor communication between known Mexican Mafia members and/or associates. Additionally, Mexican Mafia use contraband cell phones and three-way calling to communicate with members and associates while in jail or prison.

//

//

//

### Purposes of The Enterprise

15.   The purposes of the Enterprise included the following:

a.   Enriching the members of the Mexican Mafia through, among other things, drug trafficking and the collection of taxes from drug traffickers and street gangs.

b.   Controlling illegal activities such as drug trafficking and extortion inside California and Federal prisons and jails.

c.   Controlling the activities of street gangs throughout Southern California and elsewhere.

d.   Preserving, protecting and expanding the power of the Mexican Mafia through the use of intimidation, violence, threats of violence, assaults and murders.

e.   Preserving the continuity of membership in the Mexican Mafia by threatening members, associates and facilitators wishing to leave the Mexican Mafia with violence, assault and murder.

f.   Promoting and enhancing the Mexican Mafia and the activities of its members and associates.

### Means and Methods of The Enterprise

16.   Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the Enterprise were the following:

a.   Members of the Mexican Mafia use the Mexican Mafia criminal enterprise to commit, attempt and threaten to commit, acts of violence, including murder and assault, to protect and expand the Enterprise's criminal operations.

b.   Members of the Mexican Mafia use the Mexican Mafia criminal enterprise to promote a climate of fear through violence and threats of violence.

8

c.    Members of the Mexican Mafia promulgate certain rules to be followed by all participants in the Mexican Mafia criminal enterprise including the rule that a participant in the Enterprise not act as an informant to law enforcement authorities regarding the activities of the Enterprise.

d.    To enforce the rules of the Mexican Mafia criminal enterprise and to promote discipline, the members of the Mexican Mafia use the Enterprise to murder, attempt to murder, assault and threaten those participants in the Enterprise and others who violate the rules or pose a threat to the Enterprise.

e.    To generate income, participants in the Mexican Mafia criminal enterprise are entitled to conduct, and, in fact, conduct illegal activities under the protection of the Enterprise.

f.    To generate income, participants in the Mexican Mafia criminal enterprise engage in the trafficking of controlled substances and collect "taxes" from narcotics traffickers.

g.    To generate income, participants in the Mexican Mafia criminal enterprise collect taxes from street gangs.

h.    To generate income, participants in the Mexican Mafia commit robberies.

i.    Members of the Enterprise and their associates distributed and conspired to distribute controlled substances, including methamphetamine, in the Southern District of California, and elsewhere, which affected interstate commerce.

j.    Members of the Enterprise and their associates promoted a climate of fear through violence and threats of violence.

k.    Members of the Enterprise and their associates possessed, carried and used firearms to protect their operation from

9

1  theft, robbery, and competition from others.   These weapons were

2  possessed, carried and used for various reasons, including but not

3  limited to: to protect the Enterprise's narcotics and the proceeds of

4  drug distribution; to ensure that drug distribution activities were

5  controlled by the members of the enterprise and their associates; to

6  intimidate others from attempting to steal the Enterprise's narcotics

7  and proceeds from drug distribution; to rob others, to extort money

8  and services from others and to ensure the personal safety of members

9  of the Enterprise.

10                    **THE PATTERN OF RACKETEERING ACTIVITY**

11       17.   The   pattern   of   racketeering   activity,   as   defined   in

12  Title 18, United States Code, Sections 1961(1) and 1961(5), through

13  which MAURICIO MENDEZ, aka Psycho, aka Cyco, ERNEST SOQUI, aka

14  Criminal, PHILLIP MCMILLEN, aka Chino, ARCADIO NIETO, aka Mugsy, RUBEN

15  GONZALEZ, DAVID RIVAS, aka Espanto, GARRETT ESTOCK, aka Chino, ERNEST

16  LAMPLEY, aka Dopey, ROSARIO MERCADO, aka Chaio, MELVIN BERG, aka

17  Casper, RODOLFO LOPEZ, aka Crazy, aka Crazy Boy, GERARDO CANELA, aka

18  Pirate, aka Looney, EDUARDO MACIAS, aka Funny (collectively

19  "Defendants"), and their co-conspirators agreed to conduct and

20  participate in the conduct of the affairs of the enterprise consisted

21  of multiple acts involving the following offenses chargeable under

22  state law:

23            (a)   attempted murder, in violation of   California Penal

24  Code, Sections 187, 189, 182, 31, and 664;

25            (b)   robbery, in violation of California Penal Code,

26  Sections 211 and 212.5;

27            (c)   kidnapping, in violation of California Penal Code,

28  Section 207;

10

1    (d)  extortion, in violation of California Penal Code,

2    Sections 518, 519 and 520;

3        and multiple acts involving the following provisions of federal

4    law:

5        (e)  robbery and extortion in violation of Title 18, United

6    States Code, Section 1951;

7        (f)  possession with intent to distribute and distribution

8    of methamphetamine, in violation of Title 21, United States Code,

9    Sections 846 and 841(a); and

10       (g)  conspiracy to distribute methamphetamine in violation

11   of Title 21, United States Code, Section 841(a)(1).

12   All in violation of Title 18, United States Code, Section 1962(d).

13   <u>**Count 2**</u>

14       That on or about August 30, 2008 in the Southern District of

15   California, and elsewhere, defendants MAURICIO MENDEZ, aka Psycho or

16   Cyco, PHILLIP MCMILLEN, aka Chino, RUBEN GONZALEZ, ~~JOSE~~ JORGE Gm LERMA-DUENAS,

17   aka Blue, and JESUS RODRIGUEZ did unlawfully obstruct, delay and

18   affect, and attempt to obstruct, delay and affect, commerce as that

19   term is defined in Title 18, United States Code, Section 1951, and the

20   movement of articles and commodities in such commerce, by robbery as

21   that term is defined in Title 18, United States Code, Section 1951,

22   in that the defendants did unlawfully take and obtain personal

23   property consisting of four motor vehicles, over $2,000 in United

24   States currency, a laptop computer, and various pieces of jewelry,

25   from in the presence of the victim, who was involved in the

26   distribution of drugs, against his will by means of actual and

27   threatened force, violence, and fear of injury, immediate and future,

28   to his person that is, the defendants took the property by threatening

11

1   the victim with handguns; all in violation of Title 18, United States

2   Code, Sections 1951 and 2.

3                              **Count 3**

4        That on or about August 30, 2008, in the Southern District of

5   California, and elsewhere, defendants MAURICIO MENDEZ, aka Psycho or

6   Cyco, PHILLIP MCMILLEN, aka Chino, RUBEN GONZALEZ, ~~JOSE~~ JORGE o— LERMA-DUENAS,

7   aka Blue, and JESUS RODRIGUEZ did knowingly, willfully, and unlawfully

8   affect and attempt to affect interstate commerce and the movement of

9   articles and commodities in interstate commerce by extortion, in that

10  the defendants did unlawfully take and obtain personal property

11  consisting of over $2,000 in United States currency, and various

12  pieces of jewelry, from the victim, an individual involved in the

13  distribution of drugs, with the individual's consent, by inducing the

14  individual to part with the property, that was not due defendants, by

15  the wrongful use of actual and threatened force, violence and fear,

16  that is, the defendants took the property by threatening the Victim

17  with handguns; in violation of Title 18, United States Code,

18  Sections 1951 and 2.

19

20  This complaint is based on the attached Statement of Facts

21  incorporated herein by reference.

22

23  _____
    GRANT MANN
    Special Agent, FBI

24

    Sworn to me and subscribed in my presence this 12th day of February,

25  2009.

26  _____

27  RUBEN B. BROOKS
    UNITED STATES MAGISTRATE JUDGE

28

                              12

1  UNITED STATES

2       v.

3  MAURICIO MENDEZ, et. al.

4                          **STATEMENT OF FACTS**

5       GRANT MANN, being duly sworn, states:

6       The following is based on my own investigation, oral and written reports by other law

7  enforcement officers, physical and electronic surveillance, interviews, subpoenaed and public records,

8  database checks, searches, phone analysis, and other investigation.  Since this affidavit is for a limited

9  purpose, I have not included every fact I know about this investigation.  I set forth only facts necessary

10 to establish foundation for the complaint.  Conversations below are set forth in substance unless noted,

11 and most call descriptions are based on summaries, not final transcripts.  The interpretations of certain

12 statements are set forth in brackets.  Dates and times are approximate.

13          **I.      MEXICAN MAFIA BACKGROUND**

14      The charges set forth in this Complaint arise out of an investigation of the Mexican Mafia prison

15 gang (also known as the "EME").  The Mexican Mafia is the largest and most established prison gang

16 in the United States.  The Mexican Mafia was initially formed in the California state penal system and

17 has been in existence for over thirty years.  As of the present date, the Mexican Mafia operates both in

18 the California state prison system (as well as in other states) and in the federal Bureau of Prisons.  The

19 Mexican Mafia operates under a hierarchical system with three basic levels – members, associates, and

20 soldiers. The EME is further governed by a basic set of rules and operating procedures which are

21 enforced through internal discipline, including acts of violence.

22      The Mexican Mafia conducts and controls illegal activities not only in various penal facilities

23 but also on the street.  The Mexican Mafia's primary illegal activities are drug trafficking, extortion,

24 internal prison discipline, and violent crimes.  Although most Mexican Mafia members are incarcerated,

25 members and their associates control large, violent criminal gangs that operate outside of the federal and

26 state penal systems under the general authority of the Mexican Mafia.  The Mexican Mafia exerts

27 significant control over most Southern California Hispanic street gangs – also known as "Sureno" gangs.

28 Through a variety of means, incarcerated Mexican Mafia members and their associates communicate

1    with their subordinates out of custody, who carry out various criminal activities on behalf of the

2    respective Mexican Mafia member or associate. A percentage of the profits from these illegal activities

3    outside of the federal and state penal systems is then transferred to the respective Mexican Mafia

4    member or associate, or to other designated individuals, such as family members – these monetary

5    transfers are accomplished in a variety of ways, including the use of money orders. Money generated

6    from illegal activities (primarily extortion and drug trafficking) taking place inside penal facilities is

7    transferred in the same ways.

8           The Mexican Mafia has established a reputation with both law enforcement and other criminals

9    as being a highly violent organization. Numerous members and associates of the Mexican Mafia have

10   been convicted of violent crimes, including murder, robbery and assault. Mexican Mafia members and

11   associates have also committed numerous acts of violence targeting individuals, both in custody and out-

12   of-custody, based upon the belief that these individuals were cooperating with law enforcement.

13          The highest level of authority in the Mexican Mafia is membership (members may also be known

14   as "Brother" or "Carnal" or "Tio"). The Mexican Mafia does not have a single individual who runs the

15   entire organization. Rather, under the rules of the gang, members are considered to have equal authority

16   and power within the organization; there are approximately 200 members of the Mexican Mafia,

17   according to intelligence gathered by state and federal investigators. New members are elected into the

18   gang through a vote of existing members. Once inducted into the gang, members are able to control the

19   criminal activities of the lower levels in the gang so long as the respective member's actions do not

20   violate the internal rules of the organization.

21          To carry out the illegal activities of the gang, Mexican Mafia members utilize high-level

22   associates (also known within the gang as "camaradas"). Members invest these high-level associates

23   with authority to oversee Mexican Mafia operations in specific areas, both in penal facilities and on the

24   street. The delegation of authority to control a specific area on behalf of the Mexican Mafia is known

25   within the gang as giving "the keys" to the individual. Thus, a "key-holder," (also called a "llavero" or

26   "shot-caller") is an individual who has been placed in charge of a gang, neighborhood, prison, or prison

27   yard for the purpose of overseeing the Mexican Mafia's illegal operations. As an example, an associate

28   can be given "the keys" to run a gang or neighborhood in San Diego or can be given "the keys" to run

6

1   a specific yard in a prison. These associates are able to order Sureno gang members to carry out illegal

2   activities in the areas over which the associates have authority. The associates are responsible for

3   ensuring that Mexican Mafia operations (including extortion and drug trafficking) run smoothly, that

4   Mexican Mafia rules and authority are enforced, and that the proceeds of illegal activities are properly

5   distributed. For example, a "llavero" would be responsible for ensuring that part of the proceeds from

6   the illegal activities in his area of control are sent to the Mexican Mafia member(s) for whom the

7   associate works. In this regard, the Mexican Mafia also uses a command system known as the "mesa"

8   – the table. A "mesa" is a group of camaradas and soldiers who are responsible for overseeing different

9   areas under Mexican Mafia control – in essence, a governing council. For example, in a prison setting,

10   a "mesa" would consist of individuals responsible for overseeing the various yards in the prison. On the

11   street, a "mesa" could consist of individuals responsible for overseeing various neighborhoods in a city.

12        The largest subgroup of the Mexican Mafia are the soldiers – i.e. Sureno gang members. These

13   soldiers are responsible for carrying out the orders of the Mexican Mafia and for enforcing the authority

14   of the Mexican Mafia, both inside penal facilities and on the street. As a result, soldiers are tasked with

15   helping collect "taxes" (extortion payments) with drug trafficking activities or with the commission of

16   violence.

17        The final group associated with the Mexican Mafia is referred to as "facilitators." As noted

18   above, most Mexican Mafia members are incarcerated, as are significant numbers of the gang's high-

19   level associates and soldiers. Due to their incarceration, these individuals have various levels of

20   restrictions on their ability to communicate. Facilitators, who usually do not have significant criminal

21   histories, represent one of the means used by the gang to overcome the limitations on communication,

22   as these facilitators can act as communications hubs for the gang. To further the gang's

23   communications, facilitators (1) meet with individuals (including inmates) and thereafter pass the

24   messages/information to others; (2) act as mail drops for the gang's communications; and (3) set up

25   three-way calls to facilitate phone communications between Mexican Mafia

26   members/associates/soldiers. In addition to their activities in the realm of communications, facilitators

27   aid in the handling of the gang's illegal monetary proceeds, including laundering money for the gang.

28   Finally, facilitators are involved in the smuggling of contraband into penal facilities for the gang. This

1   contraband includes drugs, cellular telephones, and written messages.

2   **II.    ADMISSIONS BY DEFENDANTS TO PARTICIPATION IN THE MEXICAN MAFIA**

3
4   Several of the defendants have admitted to being involved in the Mexican Mafia either in

5   recorded communications or intercepted letters/correspondence.  The following is a summary of some
of the admissions made by the defendants:

6
7   **1.    Mauricio Mendez, aka Psycho, aka Cyco** – Agents have recorded several calls and

meetings in which Mendez discussed Mexican Mafia business and Mexican Mafia politics.  In addition,

8   correctional officers recently intercepted a letter authored by Mendez from custody in which he

9   confirmed that he was a "member of that San Diego car club" – Mendez had been granted membership

10  status in the Mexican Mafia.  Mendez signed the letter using the Mactlactlomei, a Mesoamerican symbol

11  for the number 13, which is used to denote allegiance to the Mexican Mafia – the letter "M" is the 13th

12  letter in the alphabet.  In addition, correctional officers have recently intercepted a note authored by

13  Mendez which instructed a Mexican Mafia associate at Donovan State Prison (defendant Rodolfo Lopez)

14  to order the stabbings of four Sureno gang members.  In the note, Mendez told Lopez that another

15  Mexican Mafia member wanted Lopez to "put holes" in the targeted gang members.

16
17  **2.    Ernest Soqui, aka Criminal** – Agents have recorded several calls and meetings in which

Soqui discussed Mexican Mafia business and Mexican Mafia politics.  For example, in a meeting

18  recorded in late November 2008, Soqui detailed his relationship with defendant Mendez and other

19  Mexican Mafia members in a discussion with defendant Rosario "Chaio" Mercado – an admitted high-

20  level Mexican Mafia associate.  During the meeting, Soqui noted the various steps he and fellow gang

21  members were taking in Santa Maria, California, to conduct Mexican Mafia business.  Finally, Soqui

22  boasted about his traveling to Pelican Bay State Prison with Mendez to communicate with the leadership

23  of the Mexican Mafia that is housed in the prison.

24
25  **3.    Rosario Mercado, aka Chaio** – In late November 2008, Mercado was recorded in a

meeting admitting to being a high-level Mexican Mafia associate working for a Mexican Mafia member.

26  Mercado went on to discuss Mexican Mafia politics and Mexican Mafia illegal activities.  In a

27
28

1    subsequent audio recording in December of 2008, Mercado specifically referred to himself as a "llavero"

2    – a high-level Mexican Mafia associate – during the extortion of a Sureno gang member in San Diego.

3        **4.**    **David Rivas, aka Espanto** – Correctional officers have intercepted correspondence

4    involving Rivas that demonstrates his involvement in the Mexican Mafia.  For example, officers have

5    intercepted letters between Rivas and a Mexican Mafia member presently at San Quentin State Prison.

6    In his letter, Rivas discussed Mexican Mafia matters in code and sought the support of the member in

7    his endeavors – Rivas also sent money to the member as a form of allegiance.  The member responded

8    to Rivas in a letter and referred to Rivas as his "Sobrino" [nephew], which is a term used by the Mexican

9    Mafia to denote loyal associates or soldiers.  Rivas also has the word "Sur" tattooed on his hand.  The

10   term "Sur" demonstrates an allegiance to the Mexican Mafia.

11       **5.**    **Phillip McMillen, aka Chino**– McMillen has admitted to law enforcement officers that

12   he was a Sureno – i.e. Mexican Mafia soldier.  McMillen also has the word "Southsider" tattooed on his

13   arms – this term refers to McMillen's allegiance to the Surenos; i.e., the Southerners.

14       **6.**    **Garrett Estock, aka Chino** – In a recorded conversation, Estock admitted that he was

15   working for a Mexican Mafia member.

16       **7.**    **Melvin Berg, aka Casper** – In intercepted letters, Berg referred to himself as being a

17   member of the "family" and to running a section of Donovan State Prison for the benefit of "Grandpa"

18   – a well-known Mexican Mafia member.  Berg further referred to his operations in Donovan being

19   "blessed" by his "Tio" – the term "Tio" is used to denote members of the Mexican Mafia and in this case

20   (based upon other information in the letter) a specific Mexican Mafia member.

21       **8.**    **Rodolfo Lopez, aka Crazy, aka Crazy Boy** – In a written message intercepted by

22   correctional officers at Donovan State Prison in November 2008, Lopez referred to himself as a

23   "camarada." Lopez also stated that he was in charge of a yard in Donovan State Prison for the Mexican

24   Mafia, and that all Surenos were bound to follow his orders.  Lopez ordered assaults on other gangs by

25   the Surenos.  Lopez also ordered Sureno gang members to assault guards under certain circumstances.

26   Lopez signed the letter with a Mexican Mafia symbol, the Mactlactlomei (this symbol is discussed

27   above).  In December 2008, correctional officers intercepted a note from Mauricio Mendez, a Mexican

28   Mafia member, to Lopez ordering the latter to arrange for the stabbings of four Sureno gang members

1  at Donovan.  According to Mendez, a Mexican Mafia member wanted "some holes in" the targeted gang

2  members.

3  **III.    ACTS COMMITTED IN FURTHERANCE OF THE MEXICAN MAFIA**

4  **1.    Methamphetamine Trafficking – June 9, 2008**

5  On June 9, 2008, agents surveilled and recorded a methamphetamine transaction involving

6  defendants Mauricio "Psycho/Cyco" Mendez and Ernest "Criminal" Soqui; Mendez brokered the

7  methamphetamine deal and Soqui provided the customer with the methamphetamine.  The transaction

8  involved one- quarter pound of methamphetamine.  Agents observed Mendez travel to a location in order

9  to consummate the deal.  At the location, Mendez and the customer met with Soqui.  Mendez received

10  a $5,000 payment for the quarter pound of methamphetamine.  When asked if the methamphetamine was

11  "good," Mendez responded: "Yeah."  Soqui stated: "Hello.  Hello.  That shit is the bomb."  Mendez also

12  stated that the drugs had a "kick."  Finally, Soqui described the methamphetamine as "chunky monkey"

13  – referring to its large shards.

14  **2.    Coronado Kidnapping – August 30, 2008**

15  As a basis for the next series of acts, Mauricio Mendez and his Mexican Mafia crew became

16  involved in the collection of an outstanding drug debt for two Mexican nationals – Jesus Rodriguez and

17  Jorge "Blue" Lerma-Duenas.  The victim was involved in the distribution of marijuana with Rodriguez

18  and Lerma-Duenas, who is Rodriguez's brother-in-law.  The victim allegedly shorted Rodriguez and

19  Lerma-Duenas approximately $50,000 and failed to respond to demands that the money be paid to the

20  two immediately.  As a result, Lerma-Duenas sought help from Mendez and the Mexican Mafia to

21  recover the money.

22  On August 30, 2008, at approximately 7 p.m., according to witnesses, several individuals drove

23  to the Coronado, California, residence of the victim and his family.  Three individuals were observed

24  exiting a blue Mercedes – defendant Phillip "Chino" McMillen has admitted to owning a blue Mercedes.

25  The three individuals have been identified by witnesses as: defendants Mendez, McMillen and Ruben

26  Gonzalez.  The three defendants approached the victim's sister's boyfriend and asked his name.  All

27  three individuals were armed with handguns.  When the three defendants discovered that the individual

28

1    was not their intended victim, they forced both the boyfriend and the victim's sister to enter the house

2    at gunpoint.

3         According to witnesses, once in the house, McMillen "racked" a round into the chamber of his

4    pistol and ordered everyone to comply with their demands.  The three defendants encountered the

5    kidnapping victim almost immediately upon entering the house.  While the rest of the individuals in the

6    house were herded into the living room, the victim was taken upstairs by Mendez and McMillen.

7    Gonzalez remained downstairs to control the other people in the house.  While upstairs in the residence,

8    Mendez demanded that the victim pay them the "$54,000" owed to Rodriguez.  When the victim told

9    Mendez that he did not take any money from defendant Rodriguez, Mendez replied that they would

10   "shoot him in the knees" if they found money or a safe in the house.  Mendez further stated that the debt

11   owed to Rodriguez had "passed to us."

12        The victim was thereafter taken at gunpoint to a residence associated with Rodriguez. Gonzalez,

13   who was armed, sat next to the victim on the drive to Rodriguez's residence.  In addition to kidnapping

14   the victim, Mendez and his crew also took: (1) two Dodge trucks, (2) a white Land Rover, (3) a black

15   Mercedes Benz, (4) approximately $2,000 in United States currency, (5) two laptop computers, (6)

16   several watches, and (7) miscellaneous jewelry from the Coronado residence.  Mendez told the

17   remaining individuals in the residence that the victim would be killed if anyone called the police.  After

18   Mendez left, McMillen came back into the house and told the family not to call the police or they would

19   come back.  McMillen stated: "We are an army."

20        According to witnesses, the victim was confronted by defendant Lerma-Duenas at Rodriguez's

21   residence regarding the alleged outstanding drug debt.  Lerma-Duenas struck the victim in the face

22   during the confrontation.  Lerma-Duenas told the victim to pay the alleged drug debt or they would

23   kidnap the victim and his family.  Lerma-Duenas further threatened the victim that, if law enforcement

24   were contacted, the victim and his family would be kidnapped and killed.

25        In subsequent recorded conversations and/or phone calls, Mendez, Gonzalez and McMillen

26   admitted to being involved in the above illegal acts.  On September 16, 2008, Mendez was arrested

27   driving the grey Dodge truck that had been stolen from the residence in Coronado.

28

### 3. Meetings With Mexican Drug Trafficking Groups Regarding Cooperation Between The Criminal Organizations

Beginning in early 2008, a drug trafficking group associated with the Arellano-Felix drug trafficking organization began to interact with, and pay "taxes" to, the Mexican Mafia. The Arellano-Felix group paid its "taxes" to the Mexican Mafia primarily by providing representatives of the Mexican Mafia with drugs.

In early September 2008, agents recorded a meeting between the leader of the Arellano-Felix group and defendants Mendez and Gonzalez. The purpose of the meeting was to discuss the Arellano-Felix group's aiding another Mexican drug trafficking group associated with the Mexican Mafia. One of the leaders of the other drug trafficking group was defendant Jorge Lerma-Duenas. Lerma-Duenas' group claimed to have a means of smuggling bulk shipments of marijuana and other drugs through the international ports of entry by using commercial trucking from Mexico. However, Lerma-Duenas' group claimed that a switch in the drivers of the commercial trucks had interfered with their smuggling scheme. Mendez stated that he and other gang members intended to travel to Mexico in order to disable the uncooperative driver so that the other, co-opted driver could retake the route – it was Mendez's stated intent to break both of the uncooperative driver's legs. Mendez sought the Arellano-Felix group's aid in providing additional security for Mendez for the trip to Mexico. The leader of the Arellano-Felix group agreed to provide security for Mendez but also sought to form a larger relationship with Lerma-Duenas' drug trafficking group in order to use Lerma-Duenas' trucking route to smuggle marijuana for the Arellano-Felix group. Over the next weeks, agents recorded more meetings in which these topics were discussed between the leader of the Arellano-Felix group, Mendez and Lerma-Duenas. Mendez also brought members of his crew to these meetings, including defendants Gonzalez, McMillen and Arcadio Nieto.

### 4. Lemon Grove Kidnapping and Assault – September 11, 2008

On September 11, 2008, a female victim (who was pregnant at the time) was kidnapped, assaulted, and extorted for violating Mexican Mafia rules. According to Mendez, the victim had allegedly used Mendez's name improperly to garner the protection of the Mexican Mafia for certain activities engaged in by the victim. According to Mendez, the victim had not been given permission to

12

1    do so, and, as a result, had run afoul of the gang's rules. The defendants involved in the various crimes

2    included Mendez, McMillen, and Nieto.

3        Based upon recorded phone calls and information from confidential informant(s), on September

4    11, the victim was kidnapped by Nieto. During the kidnapping, Mendez choked the victim to

5    unconsciousness before reviving her. Mendez also told the victim that the victim was not to use his

6    name to facilitate her activities, and that she then owed money to the Mexican Mafia due to her use of

7    the organization's name. In addition, Nieto hit the victim in the head and used electric clippers to shave

8    a part of the victim's head. The victim was subsequently allowed to leave.

9        Shortly after the kidnapping, agents recorded a phone call involving McMillen. McMillen stated

10   that he was in a car with "Mugsy" – Nieto. McMillen stated that he had told the victim to stay off the

11   streets. During the call, McMillen was asked: "Who went into the room and found" the victim in order

12   to kidnap the victim? In the recording, McMillen can be heard asking Nieto who found the victim.

13   Nieto responded that the victim "came to the front door." Later in the day, agents recorded Mendez

14   discussing the kidnapping. Mendez stated that he had "gone over there" because "the girl had his name

15   in her mouth." Mendez further stated that he had been involved with the victim but that he had warned

16   the victim about using his name.

17       **5.    <u>Methamphetamine Trafficking – September 10, 2008</u>**

18       On September 10, 2008, agents recorded a drug transaction involving defendants Gonzalez and

19   Mendez; the deal involved two ounces of methamphetamine. Also present at the meeting were

20   defendants McMillen and Nieto. Neither of these two individuals discussed, or otherwise participated

21   in, the methamphetamine sale. Shortly after Gonzalez and Mendez arrived at the deal's location,

22   Gonzalez took a plastic baggie of methamphetamine out from under the baseball hat he was wearing.

23   He placed the baggie into a larger plastic shopping bag and handed this bag to Mendez, who was sitting

24   on a couch with the customer. Mendez took out the methamphetamine and handed it to the customer,

25   who counted out $3,000 for the drugs. The customer then tried to give the money to Gonzalez.

26   Gonzalez did not take it, however; instead, he pointed in the direction of Mendez, to signal to Mendez

27   that he should take the $3,000. Mendez accepted the money. A few minutes later, Mendez gave the

28   money to Gonzalez.

13

1     During the deal, Mendez and Gonzalez discussed how to properly cut the methamphetamine with

2 other materials in order to increase the amount of the drug for sale. Mendez stated that "this is the best

3 one they got right now, homie." When asked whether it is "100%?" [pure methamphetamine], Mendez

4 replied "yes." Gonzalez handed the money back to Mendez, who counted it. Finally, Gonzalez stated

5 "$2,600" – "thirteen, thirteen" – Mendez and Gonzalez expected to pay their source of supply $2,600

6 for the two ounces, and they would realize a profit of $400 from brokering the drug sale.

7     **6.**     **San Diego Kidnapping and Attempted Murder – September 15, 2008**

8     The next series of events arises out of the armed kidnapping and subsequent attempted murder

9 of a male victim by defendant Mendez's crew. In a recorded meeting, Mendez admitted that the

10 kidnapping was committed on behalf of individuals in Mexico. The kidnapping was foiled when the

11 victim succeeded in fleeing his kidnappers. At that time, one of the kidnappers, McMillen, attempted

12 to shoot the victim but missed. Officers recovered a .40 caliber shell casing at the scene of the shooting.

13     On September 15, 2008, agents recorded a call from Mendez in which Mendez stated that: "We

14 have something kicking off." Mendez further stated that the "whole crew" [based upon the

15 investigation, Mendez's crew included defendants Nieto, McMillen and Gonzalez][1] was going to be

16 involved. On that date, at approximately 7:30 p.m., the victim was kidnapped at gunpoint by three

17 armed males from a McDonald's restaurant in San Diego. The victim was preparing to leave the

18 McDonald's parking lot in his vehicle when he was approached by a Hispanic male who asked the

19 victim for directions. Before the victim could get into his vehicle, another Hispanic male came to the

20 passenger window with a gun and told the victim to get out of the vehicle. The victim was removed

21 from his vehicle and placed back in his vehicle's back seat with the male who had come to the passenger

22 window. Another male also got into the back seat of the victim's vehicle and pointed a gun at the

23 victim. The last of the three kidnappers drove the victim's vehicle, with the victim in the back seat, out

24 of the lot. The victim was told to keep his head down and that he would be shot if he caused problems.

25 The kidnappers then drove the victim to a location in Chula Vista.

26

27

28     [1]     At least four individuals were involved in the kidnapping.

1   When they got to Chula Vista, the victim saw a light-colored pickup truck with a male sitting in

2 it. As the kidnappers attempted to transfer the victim from his car to the truck, the victim was able to

3 break free and run. During the flight, one of the kidnappers (who we have identified as McMillen) fired

4 a shot at the victim but missed. At approximately the same time as the shot was fired, the victim tripped

5 and fell while attempting to flee the kidnappers. The victim was able to escape and call the police.

6   At approximately 9:40 p.m., in a recorded call, McMillen was asked if McMillen "got that fool?"

7 [shot the victim]. McMillen replied that he "let loose and the guy fell down then got right back up," but

8 McMillen was unsure whether the victim had been shot; as noted above, the victim tripped at

9 approximately the same time as someone shot at him. McMillen also stated that "it jammed on him"

10 – his gun jammed. McMillen also stated that Mendez was with him at that time. At approximately 9:50

11 p.m., agents recorded a call in which Mendez stated that "all four" of them were together in a house and

12 waiting to see what would happen.

13   Later that night, agents recorded a meeting involving Mendez and Nieto. In the meeting, Mendez

14 recounted that they had attempted to kidnap a person who eventually got away. Mendez took

15 responsibility for the failed kidnapping. When asked if the victim had been shot, Mendez stated that he

16 believed that the victim had been "hit" but that the gun "jammed" so the victim got away. In addition,

17 Nieto physically reenacted the victim's stumbling as the victim was allegedly shot. Mendez further

18 stated that they had committed the kidnapping on behalf of individuals in Mexico and that the victim

19 was to be taken to Mexico by Mendez and his crew; Mendez stated that he and his crew planned on

20 obtaining as much money as possible from the victim before taking him to Mexico.

21   Police recovered a .40 caliber shell casing and a partially deformed slug at the scene of the

22 shooting in Chula Vista. The victim's car was also recovered in Chula Vista.

23   **7.** **Methamphetamine Trafficking – October 23, 2008**

24   On October 23, 2008, agents recorded one quarter-pound methamphetamine deal involving

25 defendant Soqui, who brokered the deal between a customer and Soqui's methamphetamine connection.

26 The customer was recorded counting out $5,500 as the purchase price for the methamphetamine.

27 Subsequently, Soqui received "gas money" for his role in setting up the transaction. Soqui laughed at

28 the notion of "gas money" and said that the money will be for "gas and a couple of pistols." Soqui also

15

1  discussed the upcoming arrival of Soqui's drug connection and whether the connection was paying taxes
2  to the Mexican Mafia.  Soqui confirmed that his connection was paying taxes to the Mexican Mafia.
3  Soqui further stated that if the connection had not been paying the appropriate taxes, the connection
4  "would have been in the trunk already."  Soqui confessed his willingness to start "slicing faces -- happy
5  faces and sad faces."  Shortly thereafter, the methamphetamine transaction concluded for $5,500.

6  **8.  Extortion and Assault of a Drug Trafficker – December 13, 2008**

7  On December 13, 2008, agents recorded a meeting during which defendants Rosario "Chaio"
8  Mercado, Ernest "Dopey" Lampley and Garrett "Chino" Estock were involved in the extortion of a drug
9  dealer.  The drug dealer was extorted after it was determined that the dealer had made a false claim that
10 one- half pound of methamphetamine was stolen from him by gang members acting under the authority
11 of a Mexican Mafia member.  Mercado is an admitted high-level Mexican Mafia associate.  Lampley
12 is a member of Mercado's Mexican Mafia crew;  Estock, who has admitted to working for the Mexican
13 Mafia member, works in conjunction with Mercado and his crew.  During the extortion, Estock punched
14 the victim in the face, and Mercado's crew took the victim's vehicle as collateral for the $3,000 extortion
15 payment.  Both Estock and Lampley threatened to kill the victim if the victim involved the police.

16 Specifically, the individuals noted above went to the victim's house; the victim was at the
17 residence along with two other unidentified males.  Agents were able to record the meeting.  Mercado
18 noted that "some boys came over last night."  The victim stated that was true.  Mercado further stated
19 that "there is a half [pound of methamphetamine] missing."  At that point, the victim began to waffle
20 as to whether a half-pound of methamphetamine had actually been taken.  Mercado demanded a "yes
21 or no" answer.  The victim continued to waffle as to the theft of the drugs.  Mercado told the victim that
22 if the drugs were missing, "it was going to come out of" Mercado.  While Mercado was trying to get an
23 answer from the victim, Estock punched the victim in the face and told the victim to pay attention to
24 Mercado.  Estock also told the other two males present with the victim that if they made a move, Estock
25 "would crack them too."  Mercado subsequently told the victim that the victim now owed $3,000 for
26 involving Mercado in this matter.  Mercado further stated that the money had to be paid by the following
27 day and that they were taking the victim's car until he paid the $3,000 extortion amount.  At that point,
28 Lampley told the victim that he was "lucky" to pay only $3,000 because a half-pound of

1  methamphetamine cost $9,000.  Mercado stated that the victim "better have" the money by 5 p.m. on

2  the following day.  Both Lampley and Estock then threatened the victim and the other two men not to

3  involve the police.  Estock specifically stated that, if the police were involved, Estock would "put a

4  bullet" in the victim's head.  Mercado and the others then left and took the victim's car.

5          **9.**     **Extortion – December 14, 2008**

6        On December 14, 2008, agents recorded a meeting between Mercado, Lampley, Estock and a

7  Sureno gang member at a Ralph's supermarket in National City.  The meeting arose out of a

8  confrontation that the gang member had with a Mexican Mafia member's son.  Mercado, Lampley and

9  Estock attended the meeting on behalf of the member, along with the son.  All three individuals were

10  recorded introducing themselves during the meeting.  Mercado questioned the gang member as to what

11  he had done in his meeting with the son, including whether the gang member had made disparaging

12  comments regarding the Mexican Mafia member.  Mercado stated that he had been a "llavero" [high-

13  level Mexican Mafia associate] "for years."  Mercado eventually told the gang member that, because he

14  had no money or property, the gang member would have to do a "favor" for the Mexican Mafia

15  member's crew.  Mercado also threatened the gang member that if the favor was not performed, the gang

16  member would be subjected to physical reprisal.  The gang member thereafter agreed to do the "favor."

17  After the gang member left, Mercado told Lampley that Mercado did not believe that the gang member

18  could handle anything that required too much thinking.  Mercado told Lampley to have the gang member

19  do a robbery.     **10.**     **Extortion/Assaults in San Diego Detention Facilities – 2008**

20        In recorded telephone conversations from custody, defendant Eduardo "Funny" Macias made

21  several statements identifying himself as a Mexican Mafia associate involved in extortion and violence

22  on behalf of the gang.  For example, in a recorded call on April 4, 2008, Macias discussed with another

23  individual how to send money (illegal Mexican Mafia proceeds generated in Macias' detention facility)

24  to that person.  The individual confirmed that a Mexican Mafia member had given Macias the "keys"

25  (Mexican Mafia authority) to the detention center.  Macias stated that if he left, the "keys" would pass

26  to "Smurf from the Blocks" – believed to be a member of the Old Town National City Block Boys street

27  gang.  In a recorded jail call on April 24, 2008, Macias called the same person and told him/her that a

28  gang member was "burning" [stealing money from] people.  Macias further stated that he had sent two

individuals to give the gang member some "love taps" and to put him on a "payment plan."[the gang member was being forced to pay money to the Mexican Mafia.]  In another recorded call, on May 6, 2008, Macias stated that the above-referenced gang member received some "thug love"[was assaulted] by two individuals working for Macias.  Macias stated that the gang member was assaulted because he told "the homie [a Mexican Mafia member] that he [the gang member] couldn't help him out," [pay money to the member] and then robbed a woman who was "putting food on the homie's table" [paying extortion to the member].  Macias further stated that the gang member's actions were a reflection on Macias and "when you got the city, you got to rule with a firm hand."

In a recorded call on May 25, 2008, Macias stated that he had been moved to the Vista Detention Center after serving a period of time in the Administrative Segregation Unit ("Ad Seg") of the South Bay Detention Center.  Macias was placed in Ad Seg after he and another Sureno gang member assaulted a white inmate.  This assault will be discussed below.  In the call, Macias stated that he "and Smurf from the Block set it off on the white boys in 4A" [Macias' prior housing unit at South Bay].  Macias then discussed who had the "keys to" [Mexican Mafia authority to control] the Vista Detention Center.  Macias was told that the Surenos in the Vista Detention Center were not sending money to the applicable Mexican Mafia member; the illegal proceeds expected from Sureno-controlled areas of the detention center.  Macias responded that money was being collected from each module every week.  Macias further stated that he would "get at him today" [talk to the keyholder regarding the extortion payments].

In 2008, Macias committed three separate Sureno assaults in two different detention centers.  These assaults include the following:

May 12, 2008 – A San Diego Deputy Sheriff witnessed Macias and another National City gang member chase a white inmate down in Module 4A of the South Bay Detention Center.  The two Sureno gang members then punched and kicked the other inmate.  The deputies were able to stop the attack.  As discussed above, Macias admitted that he and the other inmate "set it off on the white boys in 4A."

July 22, 2008 – At the Vista Detention Center, an inmate alerted officers that he needed medical attention.  The victim had been beaten, had a cut on his face, and had the back of his head slashed (approximately two to three inches).  The victim subsequently passed out and had to be transported by ambulance to a hospital.  Deputies reviewed the video recording for the area where the attack occurred

18

1   and observed four inmates run into the victim's cell.  Shortly thereafter, the four inmates ran out of the

2   victim's cell right before the victim himself ran out and alerted officers to his injuries.  The four inmates

3   went directly to two cells and shut the cell doors.  Officers were able to identify the four attackers

4   because they were still locked in the two cells.  Macias was one of the four inmates in the two cells.  The

5   victim was subsequently attacked again by individuals linked to the Surenos.

6        <u>September 11, 2008</u> – At the Vista Detention, a San Diego Sheriff's Deputy (who was escorting

7   another prisoner) witnessed Macias and another inmate (who was also a Sureno) assault a white inmate.

8   Macias and the other inmate punched and kicked the other inmate.  Deputies reviewed the video

9   recording of the area and identified another Sureno who was also involved in the assault.  The video

10   showed all three gang members punching the victim in the head and upper body.  Macias was also

11   recorded kicking the victim in the lower back.  The victim suffered minor injuries to his head, neck and

12   lower back.  The victim had been attacked by other Surenos less than two weeks before the attack

13   involving Macias.

14       **11.**    **<u>Drug Trafficking and Extortion at Donovan State Prison – 2008</u>**

15        Defendant Gerardo Canela (also known as "Looney" or "Pirate") has been identified as being

16   in charge of Mexican Mafia activities in one of the yards at Donovan State Prison.  Canela's

17   responsibilities included overseeing drug trafficking and extortion by the gang and ensuring that money

18   collected from EME activities was forwarded to a Mexican Mafia member.  In this regard, agents have

19   recorded several calls from Canela and his girlfriend regarding both the transfer of money from illegal

20   activities occurring in Donovan and Mexican Mafia business.

21        On May 14, 2008, in a recorded call, Canela's girlfriend called a facilitator and identified herself

22   as "Gerardo's girl" calling "about the car payment" [the monthly Mexican Mafia payment from the

23   prison]. Canela's girlfriend stated that "Gerardo called" her the previous evening, and told her to contact

24   the facilitator regarding the "car payment."  Canela's girlfriend further stated that she had $300 and

25   would have another $200 the following day.  At approximately 5 p.m., the following day, Canela's

26   girfriend again called the facilitator to arrange a meeting at a supermarket in El Cajon to deliver the

27   money.  At approximately 8 p.m. on the same date, in a recorded call, Canela asked the facilitator: "you

28   got that right?" – referring to the money delivered by Canela's girlfriend.  Canela also asked whether

1  the facilitator had received money from other Mexican Mafia associates who were overseeing other

2  yards in the prison, including "Casper" – identified as defendant Melvin Berg. Canela and the facilitator

3  further discussed a drug shipment that had been sent into the prison and how the drugs had been handled.

4  Finally, Canela gave a list of names of people who would be forwarding money to the facilitator – one

5  means of paying the Mexican Mafia.

6        On May 21, 2008, agents recorded a call in which Canela called the facilitator to alert the

7  facilitator that an inmate may have compromised the contraband cell phones that the Mexican Mafia was

8  using in the prison to communicate and conduct business. Canela also called to complain that his

9  younger brother was attacked by Surenos on a different yard due to a belief that Canela's younger brother

10  had been with a girl that was too young. Canela asked "What are we gonna do about them fools that did

11  it?"

12        On May 25, 2008, agents recorded a call in which a facilitator asked Canela if he "got into it with

13  [assaulted] somebody on the yard." Canela replied that he had because "the fools were disrespecting."

14  Canela stated that he had to "get some fool off the yard that . . . told on the homies" – Canela was

15  planning an assault on an individual believed to be cooperating with law enforcement. Canela further

16  stated that he had told two inmates about the impending assault, and the inmates told the target. As a

17  result, Canela confronted the two inmates and agreed to settle the matter in a cell so that they would not

18  be observed by correctional officers. According to Canela, "I brought them both into the cell and

19  whooped their ass for disrespecting. I'm trying to handle the yard . . . . And for them to open their mouth

20  on something that has nothing to do with them . . . I didn't even ask them to do nothing for me . . . All

21  I did was say . . . a fool . . . be careful . . . this shit is going to go down. Walk away. You might get

22  shot" [shot by the guards when the attack took place]. Canela also discussed money's being sent out of

23  the prison by other associates including "Casper" – defendant Melvin Berg. The following day, in a

24  recorded call, Canela asked the facilitator to "run a check" [check the Mexican Mafia status] on another

25  inmate from Los Angeles who was refusing to pay his "taxes" to a Mexican Mafia member because he

26  claimed that he was working for Mexican Mafia members from the Los Angeles area. On June 6, 2008,

27  in a recorded call, Canela discussed his problems in effectively running his yard in Donovan for the

28  Mexican Mafia.

1       In September of 2008, agents recorded a series of calls where Canela's girlfriend arranged to

2  make further payments to the facilitator on behalf of Canela.  As an example, on September 9, 2008,

3  Canela called and told the facilitator that his girlfriend "had another 200 for" the facilitator, and

4  discussed money coming from other yards.  On September 19, 2008, Canela's girfriend called the

5  facilitator and stated that she had only $380.  Canela's girlfriend further stated that she "went to see Jerry

6  [Canela] and he is in the hole now" – Canela was in segregation at that time.  In addition to the recorded

7  calls, agents have intercepted and copied three money order receipts that correspond with individuals

8  identified by Canela and/or his girlfriend as sending money on behalf of the Mexican Mafia in Donovan

9  prison.

10       Defendant Melvin Berg (also known as Casper) has been identified as being in charge of

11  Mexican Mafia activities in one of the yards at Donovan State Prison.  Berg's responsibilities included

12  overseeing illegal activities by the gang and ensuring that money collected from EME activities was

13  forwarded to a Mexican Mafia member.  As noted above, agents have a number of recorded calls from

14  Gerardo "Looney/Pirate" Canela, a Mexican Mafia associate at Donovan, regarding Berg's transfer of

15  money from illegal activities occurring in Donovan.  Agents also have intercepted several letters

16  authored by Berg in which he discussed Mexican Mafia business and provided information as to the

17  individuals he was using to transfer money for the benefit of a Mexican Mafia member.  Finally, agents

18  have copies of a number of money orders sent from the individuals identified by Berg as working for

19  him.

20       On August 17, 2008, Berg authored a letter to a facilitator in which he asked the facilitator to

21  follow-up with "First Ave" [the 1 yard at Donovan] to ensure that the requisite payments were being

22  made to "Grandfather" [a well-known Mexican Mafia member.]  Berg also noted that "I'm sitting at the

23  dinner table solo [the mesa] right know [sic].  But I'll invite some friends as soon as some good ones

24  come ok" – as noted above, the mesa is a Mexican Mafia governing committee.  In a series of letters in

25  August and September, Berg continued to discuss the control by the Mexican Mafia over yards at

26  Donovan and the money that was being sent out of the prison to the applicable Mexican Mafia member.

27  On October 15, 2008, Berg sent a letter again discussing the extortion money being sent to the member.

28

1   In the letter, Berg stated that "Pirate's [defendant Canela's] girl she had some chippies [money orders

2   or money] for you." He further inquired as to whether the individual had received the money.

3        Defendant Rodolfo Lopez, aka Crazy or Crazy Boy, has been identified as running the 4 yard at

4   Donovan State Prison for the Mexican Mafia. Agents also have recorded phone calls from Lopez in

5   which he discusses conducting Mexican Mafia business in Donovan, including transferring money from

6   the prison to a facilitator working for a Mexican Mafia member. On May 22, 2008, prior to getting "the

7   keys" to the yard at Donovan, in a recorded call to a Mexican Mafia facilitator, Lopez offered to

8   investigate a Sureno assault in order to determine if it was appropriate. Lopez also offered to "touch up"

9   [assault] an individual involved in the assault. On May 25, 2008, in a recorded call, Lopez inquired

10   about the status of another Sureno gang member at Donovan – Lopez was checking on whether the

11   inmate should be assaulted. Lopez also stated that he was sending a "wila" [note] to the Mexican Mafia

12   facilitator. In September 2008, agents recorded a number of calls in which a woman associated with

13   Lopez spoke to a facilitator regarding the transfer of illegal proceeds out of Donovan on behalf of Lopez.

14        As noted above, on September 27, 2008, in a recorded call, a Sureno gang member at Donovan

15   prison noted that Lopez controlled the 4 yard at Donovan for the Mexican Mafia. In late November

16   2008, a correctional officer at Donovan recovered a prison note that was authored by Lopez. In the note,

17   Lopez admitted to being a "camarada" (leader in the Mexican Mafia) and actually signed the note using

18   a Mexican Mafia symbol in conjunction with his gang alias. The note is further authenticated by the fact

19   that Lopez referred to his outstanding prison sentence for assault with a firearm. Lopez stated in the note

20   that he was running the prison for the Mexican Mafia and that his orders had to be followed. In the note,

21   Lopez admitted to past orders that all "'Others' got the verde." The term "Others" is a California prison

22   term denoting inmates who are not Hispanic (either Southern or Northern), white or African American.

23   The terms "verde" or "green" are used by the Mexican Mafia to denote individuals who have been

24   targeted for assault or murder. Lopez further confirmed his prior orders for Surenos to attack African

25   American inmates as well. Lopez also ordered all Surenos in the prison to assault correctional officers

26   in any situations where Surenos are stopped by officers and they are carrying concealed, homemade

27   knives.

28

1    Lopez's orders documented in the above-referenced note were followed by the Surenos at

2    Donovan, and resulted in assaults against both Asian and black inmates leading up to the discovery of

3    the note; these assaults took place on the yard controlled by Lopez.  On November 22, 2008, multiple

4    correctional officers witnessed two Surenos attack a black inmate.  Officers observed two inmates run

5    out of a cell and run toward the victim despite orders to stop.  The two Surenos struck the victim with

6    their fists until they were forced to stop by guards who had to use pepper spray.  On November 25, 2008,

7    multiple correctional officers witnessed three Surenos engage in a fight with four Asian inmates.  The

8    assault continued despite numerous warnings from correctional officers and the use of pepper spray by

9    correctional officers.  The attack stopped only after tear gas was used by correctional officers.

10    **12.    Methamphetamine Trafficking – November 6, 2008**

11    On November 6, 2008, agents surveilled and recorded a methamphetamine transaction involving

12    defendant David "Espanto" Rivas.  Prior to this transaction, agents recorded communications which

13    confirmed that Rivas and a Mexican Mafia facilitator had smuggled heroin into the San Diego County

14    Jail for the benefit of the Mexican Mafia in or about early November.  At approximately 7:20 p.m., on

15    November 6, agents recorded a call in which Rivas asked his customer to pick Rivas up so that Rivas

16    could obtain the methamphetamine from Rivas' drug source; the deal involved a quarter-pound of

17    methamphetamine.  The customer thereafter met with Rivas and drove him to an address in San Diego.

18    During the drive, agents were able to record Rivas discussing the fact that the methamphetamine was

19    priced at $1,300 per ounce; the two occupants of the vehicle also discussed the need for Rivas to make

20    a profit from the deal.  Rivas further stated that the drugs were "fire" – pure.  Agents thereafter observed

21    Rivas as he went into a location to obtain the drugs.  Shortly thereafter, Rivas was observed returning

22    to the vehicle.  Once back in the car, Rivas discussed the fact that the methamphetamine had come from

23    "Clever," and Rivas stated that "Clever" was his "primo."  "Clever" has been identified by agents as

24    Edgar Garcia who is presently charged in this District with several criminal charges related to

25    methamphetamine trafficking in San Diego.

26    **SEALING REQUEST**: Because this is an ongoing investigation and premature disclosure of

27    the investigation and this affidavit could endanger agents and officers, cause suspects to flee, and cause

28

23

1 | the destruction of evidence, I request that this affidavit, all arrest warrants, the complaint, and all other

2 | associated court records be sealed until further court order.

3

4 | _____
   | GRANT MANN, Special Agent

5 | Federal Bureau of Investigation

6

   | SUBSCRIBED and SWORN to before me on February *12*, 2009.

7

8 | _____
   | HON. RUBEN B. BROOKS

9 | UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24